**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JESSE LYNN and                    )
BELINDA DARNELL, on behalf of     )
themselves and all others         )    Civil Action No. 17-474
similarly situated,               )
                                  )    District Judge Mark R. Hornak
            Plaintiffs,         )    Magistrate Judge Lisa Pupo Lenihan
                                  )
            v.                  )
                                  )    ECF No. 26, 41, 63, 65, 69, 72, 75
ARC OF FAYETTE COUNTY and         )
FAYETTE COUNTY BEHAVIORAL         )
HEALTH ADMINISTRATION,            )
                                  )
            Defendants.         )

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that:

(a) the Motion for Partial Summary Judgment Restricted to the Issue of Whether

Plaintiffs Were Employees of Defendant ARC or Independent Contractors (ECF No.

26) filed by Plaintiffs Jesse Lynn and Belinda Darnell against Defendant ARC of

Fayette County ("ARC") be **DENIED** without prejudice in light of present questions

of material fact;

(b) the Motion for Summary Judgment (ECF No. 41) filed by Defendant ARC be

**DENIED** without prejudice in light of present questions of material fact;

(c) the Motion to Dismiss or in the Alternative for Summary Judgment (ECF No. 63)

filed by additional Defendant Fayette County Behavioral Health Administration

("FCBHA") be **DENIED** without prejudice as it is not clearly futile to afford

Plaintiffs an opportunity to further amended their Complaint, and there may be questions of material fact as to the relationships between Plaintiffs and both Defendants ARC and FCBHA.  FCBHA's Motion in the Alternative is premature - there having as yet been no discovery directly by or from FCBHA, which may follow Plaintiffs' sufficient statement of a claim;[1] and

(d) the Motion to Amend Complaint in Response to Motion to Dismiss (ECF No. 69) filed by Plaintiffs be **GRANTED** in the form of an Order that Plaintiffs be directed to file a Second Amended Complaint within twenty (20) days from the date of the Court's Order on these motions.  The Court notes, however, its concurrence with Defendant FCBHA's assertion that the proposed minimally-amended Second Amended Complaint at ECF No. 69, Ex. A, is unlikely to meet the applicable standard.  *See* FCBHA's Response to Plaintiff's Motion to Amend Complaint, ECF No. 71.

(e) the Motion for Reconsideration of this Court's Order on the Motion for Joinder or in the Alternative to Stay (ECF No. 65) filed by Defendant FCBHA be **DENIED** as there is no basis to alter the Court's previous holding permitting joinder (ECF No. 33) and the Motion in the Alternative – to stay pending determinations on summary judgment - will be rendered moot by the Court's Order on the pending Motions for Summary Judgment;

---

[1] Plaintiffs amended their Complaint to add FCBHA by three largely designatory or conclusory paragraphs and a pluralization of "Defendant", *see infra*, and they had not amended their original Motion for Partial Summary Judgment which remained directed to a determination of employment by ARC.  ECF No. 26; FCBHA's Brief in Support of Motion, ECF No. 64 at 5. Plaintiffs had, however, raised allegations of joint employment status by FCBHA in their Brief in Response to ARC's Motion for Summary Judgment, ECF No. 53.

(f)  the Motion for Summary Judgment (ECF No. 72) recently filed by Plaintiffs against Defendant FCBHA be **DENIED** without prejudice in keeping with the Court's other rulings above; and

(g)  the Motion to Strike Plaintiff's Motion For Summary Judgment (ECF No. 75) filed by FCBHA be **DENIED AS MOOT** given the Court's recommendation as to said Motion.

## II.  <u>PROCEDURAL AND FACTUAL BACKGROUND</u>

### A.  PENDING SUMMARY JUDGMENT MOTIONS

Among the six Motions identified as presently before the Court are the four aforesaid Motions for Summary Judgment: those filed by Plaintiffs, husband and wife, Jesse Lynn ("Lynn") and Belinda Darnell ("Darnell"), and by Defendant ARC, together with the aforesaid Motion to Dismiss or in the Alternative for Summary Judgment filed by Defendant FCBHA. ECF Nos. 26, 72, 41 and 63, respectively.  Plaintiffs filed this action against Defendant ARC on April 13, 2017 as a putative "collective/class action under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 207(a) & 216(b), and the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.104(c) & 333.113 to recover damages for non-payment of statutorily required wages".  Complaint, ECF No. 1, at 1.  Plaintiffs claim monies owed in payment of wages for work performed in connection with ARC's non-profit agency provision and facilitation of care and support services to Medicaid funding-eligible, intellectually-disabled clients ("Recipients") in Uniontown, Fayette County.  <u>Id</u>. at 3; ARC's Appendix to Brief in Support, ECF No. 43, Ex. A (Zinck Affidavit), ¶ 5.  The Complaint claims failure to pay "proper minimum wages and overtime compensation" for an asserted three-year Class Period of April 10,

2014 through April 10, 2017.  ECF No. 1 at 9-10.  The Initial Case Management Conference was

held in October 2017 and the parties were not in agreement as to whether it would be worthwhile

to mediate early in the case or wait until a decision was made as to whether Plaintiffs were

employees of ARC or independent contractors.  ECF No. 17.  The Court agreed to delay ADR

and allow discovery on the issue to take place. ECF No. 21.

    In the interim, on April 10, 2018, this Court issued an Order granting Plaintiffs' Motion

for Joinder.  ECF No. 33. On April 23, 2018, before the Amended Complaint was filed, ARC

filed its Motion for Summary Judgment. ECF No. 41.

    Plaintiffs' Amended Complaint was filed on April 25, 2018, adding FCBHA as an

additional defendant in this case on an assertion that ARC and FCBHA are joint employers of

Plaintiffs.  ECF No. 46; *see also* ECF No. 64 at 2 (noting Plaintiff's assertion that FCBHA is a

joint employer under the United States Department of Labor, Wage and Hour Division,

Administrator's Interpretation No. 2014-2) ("DOL/WHD 2014-2").   Plaintiffs assert in general

terms that they each worked in excess of 40 hours, did not report and were not paid for all time

worked, *and* were not paid overtime.  ECF No. 1 at 4-5.[2]  They also claim that, between their

execution of Independent Contractor Agreements in September 2014 and their termination of

affiliation with ARC in March 2017, Plaintiffs were improperly classed as independent

_____

[2] Plaintiffs also, however, appear to later unclearly identify at least some portion of overtime
hours as hours not included in those which ARC "instructed them to report", and which
encompassed "preparing timesheets, reports or time spent in training".  ECF No. 1 at 7-8.  And
they assert that while "certain employees" have been paid for hours worked in excess of 40
hours, no "home support" employees have been paid an "overtime premium".  Id.  *Cf.* ECF No.
58 at ¶ 49 (ARC's statement that after September 2014 it did not instruct independent contractors
to submit for payment time spent preparing timesheets or reports, or in training).  The First
Amended Complaint specifies that Plaintiffs were required to attend 30 hours of uncompensated
training annually.  ECF No. 46 at ¶ 35; *but see infra*, regarding Plaintiffs' deposition testimony
as to 24 hours of required on-line training.

contractors by ARC to avoid overtime compensation.  Id. at 6.  ARC denies that it failed to fully

pay either Lynn or Darnell for any overtime prior to September 2014.  ARC's Answer to

Amended Complaint, ECF No. 58 at ¶¶ 21-23, ¶¶  30-33, ¶ 36.  ARC also contends that Plaintiffs

were engaged as independent contractors thereafter, that the classification was proper, and that

Plaintiffs should not be considered its employees.  Rather, ARC contends, to the extent Plaintiffs

were employees subsequent to September 2014, they were employees of the Recipient families

and not ARC.  Id. at ¶ 100; ARC's Brief in Support of Motion for Summary Judgment, ECF No.

42.  ARC maintains that it "functions as a referral source and funding conduit" for qualified

government-funding Recipients, their families, and their selected service providers.  ECF No. 43,

Ex. A, ¶ 11.

On July 13, 2018, while ARC's summary judgment motion was pending, FCBHA filed a

Motion to Dismiss For Failure To State a Claim, or in the Alternative, Motion for Summary

Judgment. ECF No. 63. FCBHA correctly contends that Plaintiffs' First Amended Complaint

fails to state a claim against it under the applicable standard,[3] and it further contends that it was

not Plaintiff's employer/joint employer.  FCBHA's Brief in Support of Motion, ECF No. 64.

A Motion for Reconsideration of the Court's prior Order granting Plaintiff's Motion for

Joinder was filed on July 13, 2018. ECF No. 65. This was followed by a Motion to

Amend/Correct ECF No. 63 Motion to Dismiss by Plaintiff asking to file a Second Amended

---

[3] As the FCBHA notes, Plaintiffs currently fail to plead sufficient factual content from which,
when accepted as true, it may be reasonably inferred that FCBHA is liable for the alleged
misconduct.  FCBHA's Brief in Support of Motion, ECF No. 64, at 4-5 (discussing *Ashcroft v.
Iqbal*, 556 U.S. 662 (2009) and the "plausibility determination" under *Connelly v. Lane Constr.
Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016)).  The First Amended Complaint itself does not
allege facts supportive of aspects of an employment relationship, such as those related to
"assignment of duties . . ., control over work conditions . . ., payment details . . ., or supervision .
. . ." Id. at 6.

Complaint, largely in response to the issues raised by FCBHA. ECF No. 69. A Cross Motion for Summary Judgment was filed by Plaintiffs on August 17, 2018. ECF No. 72. Finally, FCBHA has now filed a Motion to Strike that Cross Motion as it has not been allowed to conduct adequate discovery. ECF No. 75.

The question of whether a worker is an "employee" under the FLSA is a question of law which the Court may decide at the summary judgment stage if there are no questions of material fact. Unfortunately, at this juncture, the Court observes both an insufficiency of evidence and numerous questions of material fact as to various aspects of Plaintiffs' work and the degrees of control which may have been retained or exercised by FCBHA, ARC, and the Recipient families for whom Plaintiffs provided in-home support services (*e.g.*, Plaintiffs' own families). A legal determination of employment/joint employment status for purposes of the FLSA cannot be made without a more complete record and determination of the material facts; this includes the levels of control held by each entity and the Recipient families *over the working conditions of* Plaintiffs Lynn and Darnell and *the availability of work to them independent of a Defendant's control*.

## B. FAYETTE COUNTY AND THE IN-HOME SUPPORT SYSTEM

This dispute arises out of a system of heavily-regulated, Medicaid-funded in-home support for qualified individuals ("Recipients") and by extension their families. This Court's understanding of the implementation of this system in Uniontown, from the limited record,[4] is as follows.

---

[4] The parties have submitted selected pages of the Plaintiffs' December 2017 depositions and of the January 2018 deposition of ARC's Director during the time at issue, Dana Zinck ("Zinck"), together with fairly brief Affidavits and a few core documents. The Court notes that although Defendant ARC filed its Concise Statement of Material Facts, ECF No. 44, Plaintiffs have neglected to do so. Finally, the Court notes an absence or minimal submission of documentary and other evidence regarding general procedures and case-specific events material to "employment" status, *e.g.*, ARC's recruitment, retention and assignment of Family Support

The provision of "home and community based services" ("HCBS") at issue in this case is funded by federal Medicaid funds distributed, in Pennsylvania, through the Pennsylvania Department of Human Services Office of Developmental Programs ("ODP").  ECF No. 43, Ex. A, ¶ 14.  In Fayette County, the system is further administered at the Commonwealth level by the FCBHA, an authority of the Fayette County government operating under the regulations of the Pennsylvania Department of Human Services.  First Amended Compliant, ECF No. 46 at 2.  The family of a Recipient initially contacts the FCBHA to obtain HCBS, including care and assisted/activities of daily living ("ADL") services generally intended "to enhance [the Recipient's] daily living skills and to provide community involvement."  Plaintiffs' Brief in Opposition, ECF No. 53, Ex. G (Affidavit of Beth Lynn, mother of Plaintiff Lynn and his related Recipient), ¶ 4.  The families are in touch with FCBHA and third-party agencies such as ARC to discuss the desired services and goals.  Id. at ¶5.  ARC has a service-provision contract with FCBHA.  ECF No. 58, ¶ 6.  It appears that several such agencies with similar contractual arrangements with FCBHA exist within Fayette County, and the record fails to delineate whether an individual care-facilitating agency, such as ARC, is assigned to a Recipient by FCBHA, or if there is a process that includes family selection of a Recipient's initial agency.

ARC "provides" (or, as this term is used herein, also "facilitates the provision of") a variety of services to Recipients, including programming at its adult training facility in Uniontown, family living programs in which Recipients share homes with other families, early intervention programs for children exhibiting developmental disabilities, employment support

---

Persons ("FSPs") such as Plaintiffs to/from its agency list; FSP training, scheduling and supervision; family, FSP and ARC record keeping and time reporting; and – significantly - the initiation and termination of relationships between third-party agencies and the Recipient families, and their FSPs.  As noted, there has been no discovery directly by or from FCBHA following its joinder.

services, transportation services and, as related to the present case, in-home support services in which care is provided to Recipients at their residences. ECF No. 43, Ex. A, ¶ 8.[5] ARC engages with "Family Support Persons" ("FSPs") to provide in-home HCBS. Id. at ¶ 11.[6] Within the category of HCBS, three sub-categories of services are provided to Recipients: (a) "habilitation" services, which are goal-oriented services aimed at "promoting [the Recipient's] functioning and independence" (*i.e.,* ADL services); (b) "companionship" services which involve basic supervision, usually during sleeping hours; and (c) "respite" services in which an FSP stays in the Recipient's home for between sixteen and twenty-four hours to give relief to the Recipient's primary caregiver. Id. at ¶¶ 22–25. Chapter 51 of the Pennsylvania Code regulates the delivery of HCBS, including training and recording keeping by providers. Id. at ¶ 15.

In the preliminary stages of engagement, ARC develops an initial "assessment" with the Recipient family and, at the family's request, their selected HCBS provider, the FSP. ECF No. 43, Ex. B (Zinck Depo.) at 28:13-17.[7] ARC, the Recipient family, and a Fayette County

---

[5] The adult training facility in Uniontown operated for approximately sixty years "is the main function" of ARC and "utilizes the majority of [its] financial, real estate, and personnel resources." Id. at ¶ 9. ARC's transportation services for disabled clients are second in terms of investment. Id. ARC became involved with in-home support in 1997 and such services are the smallest portion of its agency operations. Id. ¶ 7.

[6] Between April 2014 and 2017, ARC retained approximately 70 to 100 FSPs. ECF No. 1 at 8; ECF No. 58 at ¶ 43. *See also* ECF No. 43, Ex. B, 16:17-17:7 (Zinck testimony that approximately 75 people moved from employee to independent contractor status in September 2014).

[7] The record is unclear as to both the FSP's (1) selection vs. assignment and (2) participation/role, which appear to vary from Recipient to Recipient, and within the course of provision of services to a particular Recipient. *Compare e.g.*, id. at ¶ 18 ("In the vast majority of cases . . . the family has already identified" its selected FSP by the time of the first meeting to discuss the development of an ISP", and "[r]oughly seventy percent of the time, this individual is a relative or friend of the [R]ecipient."] *with* ¶ 21 ("Once the ISP is approved by [FCBHA], the family selects an FSP to deliver HCBS."). Some apparent discrepancies/ambiguities may result, in part, from procedural changes made in September 2014 as part of ARC's transition of FSPs

"Supports Coordinator" then meet regarding the development of a plan of care (an Individual

Support Plan, or "ISP") which incorporates the Recipient's skills (assessment level) and needs,

the Recipient family's requested services, and goals for the Recipient.  ECF No. 43, Ex A, ¶ 18.

The information-provision, and recommendation or preference-provision, roles and degrees of

the influence of the various parties participating in preliminary meetings is less than clear from

the present record.

It does appear clear that, following the ISP meeting, the County Supports Coordinator

holds authority to prepare his/her recommended ISP, which is subject to approval by the

FCBHA.  ECF No. 43, Ex. A, ¶¶ 18 & 19.  The FCBHA also approves an "annual amount of

HCBS in the form of a fixed number of [quarter hour] units." Id. at ¶ 20.  Some Recipients are

authorized to receive more than forty (40) hours of HCBS per week, and these services are

sometimes all provided by the same FSP.  ECF No. 58 at ¶ 47.[8]  The Commonwealth pays per

---

from employee to independent contract status.  *See* id. at ¶ 33 ("Prior to September 12, 2014,
FSPs were assigned by the Arc to work with specific recipients . . . Since [then], a recipient's
family chooses the FSP it wants to work with."); ECF No. 43, Ex. E (Affidavit of current ARC
Director, Michael Dinan), ¶ 14 ("Since September 2014, the HCBS recipient's family has
selected an FSP to deliver HCBS once the ISP is approved by the County.  In over seventy
percent of cases, the family identifies a relative, friend, or other individual whom they would like
to provide HCBS to the recipient.  In the remainder of cases, the family selects an FSP from a
'pool' maintained by [ARC].").

The record also lacks clear specific information as to the manner(s) – other than Recipient family
request/referral - by which FSPs come to be in a particular agency's registry or pool (*e.g.*,
solicitation/recruitment by the agency, FSP registration, or a combination), or the manner in
which they may receive Recipient work opportunities from ARC or other agencies.  *See infra*.

[8] If, however, an FSP reports working more than the Recipient's authorized limit of weekly (and
perhaps also annual, *see infra*) hours, the FSP may have worked uncompensable hours.  ECF No.
58 at ¶ 52.

*Cf. infra* text at 13-14 (Plaintiffs' testimony that after 2006, services by Plaintiff Lynn to his
Recipient family member over 40 hours per week were first provided by him through another,
additional third-party agency and then provided through ARC by Plaintiff Darnell).

unit compensation determined by the contract it negotiates with the third-party agency.   During

the time period in question, ARC received payment from the Commonwealth at the "set rate" of

$6.38 per unit of habilitation/ADL service, or $25.52 per hour.   ECF No. 43, Ex. B, 39:11–16.

As of December 2017, ARC was paid $8.08 per unit of service, or $32.32 per hour.   Id. at 49:17–

23.   Prior to September 2014, ARC paid FSPs $10 an hour for habilitation/ADL services;

thereafter it paid FSPs $14 an hour for those services.   Id. at 36:9-13.   This wage rate was set by

ARC.   Id. at 35:11-15.   ARC submits bills for services delivered into a data system and receives

a check for Federal funds distributed through the Commonwealth.   Id. at 38:15-39:7.[9]

    Prior to or at the time the ISP and service units are approved, Recipient families select the

individual they wish to provide care as an FSP; although FSPs may have been assigned by ARC

prior to September 2014.   *See supra* n. 7; *infra*  text & n. 10; ECF No. 43, Ex. B, 23:17-24:4; Ex.

E, ¶ 14.   To qualify to provide HCBS, FSPs are required by the Pennsylvania regulations to

undergo standard training in such things as policy on intellectual disability principles, meeting

the needs identified in the ISP, prevention of abuse or neglect, incident reporting, Recipient

grievance resolution, and billing and documentation of HCBS delivery.   55 Pa. Code

§ 51.23(a)(1)–(8).   FSPs are required to obtain at least 24 hours of standard training annually and

to obtain any additional training (such as first-aid and CPR) required by a particular Recipient

family or ISP.   The standard training is available free online and some other training is available

through ARC or community resources such as the Red Cross.   ECF No. 43, Ex. A, ¶ 29 and Ex.

B, 31:4–10; ARC's Appendix to Brief in Opposition, ECF No. 51, Ex. C (Darnell Depo.), 30:24-

_____

[9] The timing of ARC's payments to FSPs for hours worked and ARC's receipt of payment for those services from the Commonwealth is not clearly of record.   *See* ECF No. 43, Ex. C, 15:3-11 (Lynn testimony that it is his understanding that ARC turns in bills, funds are distributed to ARC which are then distributed to FSPs).

33:17.  Since September 12, 2014, ARC has not compensated FSPs for their standard training time, and FSPs pay for their own additional training, although ARC has offered training such as CPR "at a low rate".  ECF No. 43, Ex. A, ¶ 36; Ex. B, 42:25; ECF No. 51, Ex. C, 33:7–12.  The present record does not indicate the extent, if any, of ARC's absorption of any cost related to an FSP's regulation-required online training or other Recipient-family-required supplemental training.  It does appear that ARC does not, of itself, impose any other training requirements on a Recipient family's selected FSP.

FSPs may accept or reject a Recipient family engagement for any reason.  Under a qualified FSP's engagement by ARC, this has no impact on the FSPs "eligibility to provide HCBS" or the "priority with which the FSP is referred to other families for potential engagements."  ECF No. 43, Ex. E, ¶ 15.[10]  A Recipient family and FSP are also each free to unilaterally "end an engagement at any time" with no "adverse impact on an FSP's ability or eligibility to provide HCBS to other families."  Id.  Just as the record importantly lacks clarity as to whether an agency such as ARC is assigned to or selected by a Recipient family, it also importantly lacks clarity regarding the termination of a Recipient-agency relationship. *See infra* (noting Plaintiffs Lynn and Darnell's conflicting deposition testimony as to the transfer of their family-member Recipient in March 2017).

An FSP accepting a Recipient family position in affiliation with ARC enters into (since September 2014) a Home & Community Habilitation Independent Contractor Agreement

---

[10] The present record does not elucidate this reference to "priority" FSP recommendations by ARC.  It is thus unclear whether an entire FSP "registry"/listing, some portion of this list determined by, *e.g.*, position in line by registration date, or some criteria-based selection of those FSP registered with ARC is provided when a Recipient family does not select a family-referred FSP.  The independent contractor agreements of record as to Plaintiffs suggest the latter, *i.e.*, that referrals are based on ARC's assessment of fit.  Plaintiff's Brief in Support, ECF No. 38, Ex. E, ¶ 1(a).  *See also infra* text at 11.

("ICA") with ARC.   Plaintiff's Brief in Support, ECF No. 38, Ex. E.  The ICA specifies that ARC will not possess or exercise "control or direction over the methods" of service provision. Id. at ¶ 2.  It also requires FSPs to complete and verify the Pennsylvania-required training, document Pennsylvania-mandated clearance and liability insurance, and submit bi-weekly billing forms and "service documents", and provides $14 per service hour compensation and no benefits.  Id. at ¶ 1, 4-5.   The FSP is required to provide any equipment (such as an automobile for transporting the Recipient as required by his/her HCBS responsibilities).  Id. at ¶ 6. Under the terms of the ICA, the FSP retains the right to terminate the ICA with notice at any time and ARC retains the right to terminate with notice or "for cause" defined as breach of contract, "conduct contrary to appropriate standards of respect, care and conduct", "serious misconduct on or off-the-job which does or may cast doubt on his/her ability to properly perform [the ICA work or] create adverse publicity", or felony conviction or plea.  Id. at ¶ 7.  A qualified FSP is free to register with/apply for simultaneous Recipient work through any agencies or individuals of his/her choice; however, the ICA prohibits separate work for an ARC-referred Recipient for two (2) years following ARC-affiliated work for said Recipient, absent ARC's written exception.  Id. at ¶ 1(b).[11]

The present record is somewhat ambiguous as to the interaction and responsibilities between a Recipient family and a third-party agency with regard to scheduling and coordinating an FSP's day-to-day working hours.  ARC provided evidence that FSPs communicate directly with Recipient families (often, as in Plaintiffs' case, their own) regarding working hours.  ECF

---

[11] This restriction apparently did not apply to Plaintiffs' continued work for their family member following that Recipient's transfer to another agency in March 2017, as the Recipient's FSP providers (i.e., Plaintiffs) were referred by the family.  *But cf.* Plaintiff Lynn's deposition testimony that ARC and FCBHA solicited him to provide services to his family member.  ECF No. 38, Ex. B, 7:25-8:17, 9:9-22.

No. 43, Ex. B, 24:5–10.  *See also* ECF No. 38, Ex. E, ¶ 1(a) (ICA provision that FSPs

"coordinate and schedule working hours with the [Recipient families]").  Plaintiffs provided

evidence that Recipient families contact ARC with their scheduling needs, and ARC

subsequently contacts the FSPs and directs them in accordance with the Recipient family request.

ECF No. 38, Ex. B, 35:5–24 (Plaintiff Lynn's testimony that ARC telephoned him to

communicate the hours his mother desired him to work). At a minimum, this record indicates

that an FSP's schedule of HCBS hours is determined by the Recipient family.

      In accordance with Commonwealth regulations, FSPs are required to verify their time

and to complete a progress note ("Encounter Form") whenever they provide care to a Recipient.

55 Pa. Code § 51.16(b).  Recipient families must review and verify the FSP's hours and services,

and sign each form, and FSPs submit them to ARC on a bi-weekly basis.  ECF No. 38, Ex. A,

26:4-14, Ex. B, 42:4-25; ECF No. 53, Ex. G, ¶¶ 20-21.  ARC is required to maintain, and make

available to FCBHA, records compiled from FSPs' invoices, documenting the services for which

it claims payment from the Commonwealth.  55 Pa. Code § 51.15(a), (d) & (f).   ARC is also

required to prepare a monthly progress report, based on the Encounter Forms, documenting the

implementation/progress of the goals outlined in a Recipient's ISP.  ECF No. 43, Ex. B, 27:12–

19. *See also* ECF No. 51, Ex. A, 20:16-21 (providing examples of client goals).  As with time

records, Recipient progress reports must be available to the FCBHA for monitoring, pursuant to

the regulations.  55 Pa. Code § 51.24(a).  The FCBHA has implemented a three-year monitoring

cycle with ARC.  ECF No. 43, Ex. B, 27:20–28:5.

## C.  CASE-SPECIFIC EMPLOYMENT HISTORY

      Plaintiffs Lynn and Darnell are former ARC FSPs.  ARC's Concise Statement of Material

Facts, ECF No. 44, ¶ 12; ECF No. 43, Ex. A, ¶ 13.  Lynn worked in connection with ARC

between July 2004 and March 2017 primarily providing ADL (*i.e.*, ISP goal-directed services) to a single Recipient family member.  ECF No. 38, Ex. B, 10:14–21; ARC's Answer to Plaintiffs' First Amended Complaint, ECF No. 58, ¶ 4.  Lynn's mother's affidavit states that ARC initially "assigned a person to provide the services described in the [ISP]" but "[i]n approximately 2004" she "contacted ARC . . . and asked if [Plaintiff Lynn] could be assigned to provide services to" his Recipient family member and ARC agreed; this employment continued through March 2017. ECF No. 53, Ex. G at ¶¶ 11-13.[12]  Lynn asserts that: From July 2004 to approximately early 2006, he provided the Recipient services between forty and fifty hours a week and was paid through ARC.  ECF No. 238, Ex. B, 12:9–18.  Beginning approximately early 2006, Lynn was no longer eligible for overtime hours and "anything over 40 hours" was transferred by the County to another third-party agency, Northwestern Human Services. Any hours in excess of 40 were, according to Lynn, "worked . . . through" Northwestern until sometime between 2009 and 2012, when "all of [the family member's] services" were transferred by the County "back to ARC."  Id. at 12:12-18, 16:15-17:1, 18:16-19:5.  After the Recipient's Medicaid funding hours were transferred back to solely ARC, Lynn was not able to work all of those hours, as overtime was unavailable; thus, Lynn's service hours were limited to forty hours per week through ARC until March 2017.  Id. at 36:14-37:17 (Lynn's testimony that his hours were cut and he "lost 16 hours a week" which "were assigned to another worker" because "ODP passed a law" restricting family members to 40 hours per week).  As noted below, the other worker who assumed those FSP hours was Lynn's spouse, Plaintiff Darnell.  In March 2017, the Recipient was transferred to another third-party agency, and ARC's relationships with that Recipient family and their FSPs

---

[12] *Compare* ECF No. 38, Ex. B, at 9-10, 13-14 (Lynn's testimony that ARC and FCBHA solicited Lynn to assume the FSP position in 2004, and asked if Plaintiff Lynn's mother would "be okay with" that).

ended. *Compare* ECF No. 38, Ex. B, 15:19–16:6 (Lynn's testimony that the County transferred

his Recipient to Open Systems Healthcare so he then worked for that agency) *with* ECF No. 38,

Ex. C, 13:6-13 (Darnell's testimony that "we", "the [Recipient] family" transferred the Recipient

to Open Systems Healthcare so she then worked for that agency). *See also* ECF No. 38, Ex. B,

20:18-25 (Lynn's testimony that he was not required to sign an ICA to "keep [his] job" but that

"it would have [taken] too long to have" the Recipient "client transferred to another agency"

because that requires "meetings [and] paperwork").

      Darnell worked in connection with ARC between January 2005 and March 2017.  ECF

No. 58 at ¶ 5.   Darnell was initially recruited by the Recipient family in 2005 to provided

twenty-four-hour "respite" services to the same Recipient-client as Lynn. These respite services

were for a 24 hours' period, 28 days annually.  ECF No. 51, Ex. C, 22:12-14.  She was also

approached by ARC to provide in-home support services to two other Recipients thereafter,

working for one Recipient for a few months, and for another Recipient into 2013. ECF No. 51,

Ex. C, 10:1–11:25.  Darnell also provided care to her Recipient grandmother through ARC and

"under a different waiver program" during sometime in 2013 through sometime in 2014.  Id. at

12:18-13:4. In approximately 2012, when the related Recipient's excess (*i.e.*, over forty hours

per week) habilitation/ADL hours were returned to ARC,[13] Darnell assumed those hours. Id. at

17:14–18:10. Darnell continued to work the same schedule previously worked by Plaintiff Lynn,

as it was what was "needed with the family." Id. at 21:2-9.  In 2013, Darnell also began

providing four days of 7-1/2 hours each of per week of "companionship" services to the related

---

[13] The present record suggests, but neither states nor clarifies, that a family-member FSP's time
may have been facilitated through more than one agency to allow that FSP to provide more than
40 hours of care under then-existing regulations, and that such FSPs returned to a sole facilitating
agency when regulatory revisions disallowed overtime for services to family members regardless
of how those hours were structured/compensated within the County system.

Recipient. Id. at 12:7-17.  In 2014, her "companionship" hours to the related Recipient

apparently increased to five days per week, or 37-1/2 hours.  Id. at 22:15-22. Darnell continued

in this work arrangement of providing all three (3) categories of HCBS to the related Recipient

family (i.e., a total of 53-1/2 hours per week, plus an additional 28 days per annum of 24 hours

respite care) until March 2017, when the Recipient was transferred to another agency.  *See supra.*

As noted, the record contains fact questions as to whether the Recipient's transfer from ARC to

Open Systems Healthcare agency was made by the Recipient family or FCBHA.


## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing

law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact

is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.*  A party seeking summary judgment "bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding a summary judgment motion, "the nonmoving party is entitled to all

reasonable inferences and the record is construed in the light most favorable to that party."

*Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002).  However, the nonmoving

party "must do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Where the record could not lead a rational trier of fact to decide in favor of the nonmoving party, no genuine dispute exists.  *Id.* at 587.

## IV.   <u>ANALYSIS</u>

### A.   QUESTIONS OF MATERIAL FACT UNDER THIRD CIRCUIT'S GENERAL "ECONOMIC REALITY" TEST FOR FLSA EMPLOYER STATUS AND POTENTIAL JOINT EMPLOYERS

As discussed above, ARC maintains that subsequent to September 2014, Plaintiffs were "engaged in activities of [ARC's] non-profit organization" as independent contractors and, to the extent they were employees, were solely the employees of their Recipient families.  ECF No. 58 at ¶¶ 100, 104.  FCBHA similarly maintains that it has had no employment relationship with Plaintiffs.

Under the Fair Labor Standards Act ("FLSA" or "the Act"), liability for non-compliance is conditioned on the existence of an employment relationship.  The term "employee" means "any individual employed by an employer," where "employ" means "to suffer or permit to work," and "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. 203(d), (g).   In addition, an employee may be employed by more than one employer and a "determination of whether the employment . . . is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case."  29 C.F.R. 791.2(a).

In determining whether a particular work arrangement is indicative of an employer-employee relationship, the Courts of Appeals have adopted multi-factor tests of "economic reality" that, while often containing several overlapping factors, vary.  The United States Court

of Appeals for the Third Circuit has held that "courts should examine the 'circumstances of the whole activity,' and should consider whether, as a matter of economic reality, the individuals 'are dependent upon the business to which they render service.'" *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985) (quoting *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981)); *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961).[14]  The Third Circuit has adopted a six-factor test to aid in this determination. *DialAmerica*, 757 F.2d at 1382–83.  The test examines:  (1) the degree of the alleged employer's right to control the manner in which the work is performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task,[15] or his employment of helpers; (4) whether the service rendered requires a special skill;[16] (5) the degree of permanence of the

---

[14] *See also Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 10-11 (D.C. Cir. 2001) (noting that employee's degree of "dependence" indicates status, *i.e.*, whether factors establish that personnel are so dependent on putative employer that they come within FLSA's protection); *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1312 (11th Cir. 2013) (court must determine "whether an individual is in business for himself or is dependent upon finding employment in the business of others").

[15] Travel expenses are also considered in determining the extent to which an alleged employee invests in his/her job performance.  *Id.* at 1386–87. The present record suggests that although the expenses in materials, equipment, and travel involved in performing the work of an FSP are relatively minimal, effective September 2014, FSPs were responsible for covering those expenses, such as the cost of transporting Recipients to, *e.g.*, community outings and doctors' appointments, as well as the cost of any additional training required by the Recipient family or ISP.

[16] The present record suggests that there are relatively few formal requirements to work as an FSP, the position generally requires only a high school diploma or equivalent, and an FSP is most often selected by a Recipient family on the primary basis of familiarity and willingness/availability to work with the Recipient.

working relationship;[17] and (6) whether the service rendered is an integral part of the alleged employer's business.[18]  *Id.*

An individual or entity determined by application of the *DialAmerica* test to be an employer subject to compliance with the FLSA may also be held to be a "joint employer" of that employee.  In the context of a determination of joint employer status, the Third Circuit has provided four additional factors that relate to the putative employer's right of control: (1) authority to hire and fire the relevant employees; (2) authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; (3) involvement in day-to-day employee supervision, including employee discipline; and (4) actual control of employee records, such as payroll, insurance, or taxes. *See In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation*, 683 F.3d 462, 469 (3d Cir. 2012).[19]

The Recipient family, ARC and/or FCBHA could – if application of the *DialAmerica* and *Enterprise* factors warranted - each be held to be an employer, and then also a joint employer, of an FSP during the April 2014 through April 2017 claim period.  As explicated in Section II, *supra*, however, the present record contains material fact questions or as yet material fact

---

[17] The court in *DialAmerica* looked to whether the workers were able to, and in fact did, freely transfer their labor between/among putative employers.  *DialAmerica*, 757 F.2d at 1384.

[18]  The court held that "workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer." *DialAmerica*, 757 F.2d at 1385.  *See supra* n. 5.

[19] In either case – employment or joint employment – the "determination of whether an employer-employee relationship exists does not depend on 'isolated factors but rather upon the circumstances of the whole activity'" and the economic reality test is the "touchstone". DOL/WHD 2014-2, *infra* (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947) and *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).  *See also Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 72 (2d Cir. 2003).

omissions pertinent to questions of Plaintiffs' employment or joint employment status, *i.e.*, the "economic reality" or "dependency" of their relationships with either of the Defendants.[20]  As outlined in Section II, there are particularly substantial material fact questions as to both (1) a Defendant's degree of control and (2) the nature and permanence of the "working relationship(s)" as those factors are delineated by the Third Circuit in both *DialAmerica* and *Enterprise*, *supra*.

### B.  MATERIAL FACT QUESTIONS UNDER REGULATORY AGENCY'S INTERPRETATIONS OF THE REVISED FLSA COMPANIONSHIP SERVICES EXEMPTION AS APPLIED TO HOME CARE WORKERS

As discussed above, ARC further maintains that, even if Plaintiffs were held to have continued in an employment relationship with ARC despite the asserted September 2014 conversion to independent contractor status, Plaintiffs were otherwise exempt from minimum wage and overtime requirements as they "performed domestic and/or companion services in or about the private home of the consumer/employer (which was not the Defendant Arc)".  ECF No. 58, ¶ 103 (citing 29 U.S.C. § 213(a)(15); 43 P.S. § 333.105(a)(2)).  FCBHA similarly maintains that Plaintiffs were not its employees/joint employees and that, moreover, they were workers within an FLSA exemption.

Section 213(a)(15) of the Act provides an exemption, known as the "companionship services" exemption, for "any employee employed in domestic service employment to provide

---

[20] ARC does not dispute an FSP employment relationship (albeit one within an FLSA exemption) prior to September 2014.  The basis of Plaintiffs' damage claims for the April 2014 to September 2014 portion of the alleged three-year action period is, however, as yet unclear in the record. *See supra*.  Defendant FCBHA denies any employment relationship.

companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." [21]

Prior to January 1, 2015, the FSP services at issue herein (the three categories of HCBS – (1) respite, (2) companionship, and (3) "habilitation" or ADL/ISP directed services) would have rendered a putative third-party employer within the companionship exemption. The services were within the scope of the exemption and the exemption applied whether a Recipient family directly hired companionship services or contracted with an agency to do so. The exemption has, however, been the subject of relatively recent revision and less-than-entirely-unambiguous interpretation; and although services qualifying within the narrowed definition of "companionship services" [22] may still exempt a Recipient family from FLSA compliance, effective January 1, 2015 they no longer exempt a third-party employer.

_____

[21] When the FLSA was enacted in 1938, establishing federal minimum wage and time and a half compensation for hours in excess of forty hours a week, it did not apply to "domestic service work", which was viewed as private rather than commercial. The law was revised in 1974 to include domestic service workers, but the companionship services exemption was created.

[22] As revised, 29 C.F.R. § 552.6 restricts the "care" and medical service components of companionship services and provides in part:

> (a) As used in section 13(a)(15) of the Act, the term *companionship services means the provision of fellowship and protection* for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of protection means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.
> (b) The *term companionship services also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek. The provision of care means to assist the person with activities of daily living* (such as dressing, grooming, feeding, bathing, toileting, and transferring) *and instrumental activities of daily living*, which are tasks that

More particularly, the Department of Labor has made revisions intended to balance equitable wage and hour protections for a growing number of home care service workers (particularly, *e.g.*, a dramatically expanding workforce of trained nurses/paramedical/health "direct care" providers) with the affordability of in-home care for infirm and disabled individuals.[23]

Under 29 C.F.R. § 552.109(a), "Third Party Employment":

> Third party employers of employees engaged in companionship services within the meaning of § 552.6 may not avail themselves of the minimum wage and overtime exemption provided by section 13(a)(15) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption, if the employee meets all of the requirements of § 552.6.

In response to litigation,[24] inquiries, and uncertainties regarding aspects of the companionship services exemption, and the restriction of that exemption to direct

---

enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).
* * *
(d) The term companionship services does not include the performance of medically related services provided for the person. The determination of whether services are medically related is based on whether the services typically require and are performed by trained personnel . . . .

29 C.F.R. § 552.6 (emphasis added)

[23] *See generally* Tatiana Oriaikhi, Home Care Workers, More Than Just Companions: The Final Rule and the Fight for Home Care Stabilization, 24 Elder L.J. 457 (2017) (examining expansion of FLSA coverage in light of aging population's choosing to "age in place" and receive in-home care, increasing demand for home care workers).

[24] The Department of Labor's revised regulations were initially challenged by businesses employing home care workers and both the elimination of the exemption for third-party agencies and the redefinition of companionship services were vacated by the District Court. *See Home Care Ass'n of Amer. v. Weil*, 78 F.Supp.3d 123 (D.D.C. 2015). However, in August 2015, the

consumer/Recipient (and no longer also third-party) employers, the Wage and Hour Division ("WHD") of the Department of Labor has issued administrative interpretations regarding the employment status of in-home care providers.  Though not afforded conclusive weight, Administrator's Interpretations are entitled to significant deference.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (holding that the interpretations of the Wage and Hour Administrator as to the FLSA constitute a body of experience and judgment upon which courts and litigants may properly rely); *see also Secretary United States Dept. of Labor v. American Future Systems, Inc.*, 873 F.3d 420, 426–27 (3d Cir. 2017).

More specifically, and as identified in the parties' briefings, the WHD has issued the following interpretations and guidelines, which must further inform this Court's determination:

1.   Department of Labor, Wage and Hour Division, Administrator's Interpretation No: 2014-1, March 27, 2014.  *Subject: The Application of the Fair Labor Standards Act to home care services provided through shared living arrangements, including adult foster care and paid roommate situations.*  ("DOL/WHD 2014-1") – In which the Administrator primarily addresses application of the Final Rule to shared living arrangements, but in so doing also addresses "how longstanding FLSA principles apply to", *e.g.*, assessments of "[t]he extent to which the third party is involved in determining a provider's conditions of

_____

Court of Appeals for the District of Columbia reversed the lower court's rulings and upheld the new rules.  *Home Care Ass'n of Amer. v. Weil*, 799 F.3d 1084 (D.C. Cir. 2015).  The DOL elected to begin enforcement of the final rule on November 12, 2015 and exercised only prosecutorial discretionary enforcement through December 31, 2015.  *See* 80 Fed. Reg. 65646-47 (Oct. 27, 2015); *U.S. Court of Appeals Unanimously Upholds DOL Rule*, U.S. Dep't of Labor, http://www.dol.gov/whd/homecare/litigation.htm.  This election did not, however, affect the Final Rule itself, and as has been held by a majority of the District Courts to consider the Final Rule's effective date in unpaid wage claims - that effective date remains January 1, 2015.  *See Brittmon v. Upreach, LLC*, 285 F.Supp.3d 1033, 1038-1041 (S.D. Ohio 2018).

employment or influencing the [day-to-day] manner in which the provider performs services". *Id.* at II(1)(b).[25]   The Administrator also discusses the narrowed definition of "companionship services" under the Final Rule.  *Id.* at II(3)(a) (noting the new regulatory definitions of "fellowship", "protection" and "care").

2.   Department of Labor, Wage and Hour Division, Administrator's Interpretation No: 2014-2, June 19, 2014.  *Subject: Joint employment of home care workers in consumer-directed, Medicaid-funded programs by public entities under the Fair Labor Standards Act.* ("DOL/WHD 2014-2") – In which the Administrator primarily addresses application of the Final Rule, and the modified third-party employment regulation, to a "public or private agency that administers or participates in a consumer-directed, Medicaid-funded home care program." *Id.* at 1.  The Administrator canvases application of the general "economic realities" test and addresses "how federal regulation of Medicaid programs affects [this] analysis" and notes the DOL's belief that "in most, but not all, consumer-directed models, a third party will be a joint employer of a provider".  *Id.* at 2.  *See also id.* at 4-5 (distinguishing "cash and counseling" programs where consumer directly hires and controls provider and work performed, and is sole employer, and state "public

---

[25] DOL/WHD 2014-1 also appears to somewhat inconsistently address the significance of setting the provider's wage rate.  *Compare id.* at II(1)(B) (noting that where a "state or intermediary agency" is a third-party agency in shared living services, and "determin[es] that the provider meets the program's qualifications, facilitat[es] matching the provider and consumer, and perform[s] follow-up visits", leaving "day-to-day provision of services" to the provider, and "set[ting] the amount the . . . provider is paid" , then "the provider . . . is likely not an employee of the consumer, [and] will be properly [ ] deemed an independent contractor rather than an employee of the third party") *with id.* (again noting distinctions in degrees of direction and management, but stating that: "Additionally, if a third party . . . is otherwise involved in determining providers' conditions of employment—such as, . . . wage rate . . .—the third party will likely be a joint employer of the provider").

authority" model in which public entity "also exercised considerable control over the

employee and the work performed" and rate and method of payment, and "was likely a

joint employer"); *id.* at 7, 9-17 (explaining and providing factor analysis guidelines,[26]

together with seven hypotheticals, for "employment status" assessment in (a) states which

"comply with federal regulations by implementing low-control functions and processes

and permitting the consumer considerable discretion" and (b) state programs which

comply "by exercising a high degree of control over the terms and conditions of a

provider's employment").[27]

3. DOL/WHD Field Assistance Bulletin No. 2018-4, July 13, 2018. *Subject: Determining*

*whether nurse or caregiver registries are employers of the caregiver* ("DOL/WHD FAM

---

[26] DOL/WHD 2014-2 analyzes the following "program variables" as indicia of employment: (1) power to hire and fire; (2) control over wage or other employment benefits; (3) hours and scheduling; (4) supervising, director or controlling the work; and (5) performance of payroll and other administrative functions.

[27] This lengthy interpretation includes discussion, and implicates material fact questions, of, *e.g.*, an agency's - regulation-compliance or non-regulation-compliance governed - setting of qualifications, involvement in consumer choice of providers, recruitment/interviewing/hiring of providers, reservation of a right to remove from a particular household or fire for poor performance, enforcement of regulatory provider prerequisites or basic/additional qualifications, approval of a mandatory service plan and the extent to which it includes job responsibilities and working conditions, supervision/management of daily work - including as reflected in the mandatory plan of care, disciplinary rights and participation, performance reviews, the setting of work hours and direct versus indirect consumer-verified reporting, tardy and absence reporting/approval requirements, pay for training and extent of state requirements, and the setting of wages (which is identified as "fundamental to the ultimate question of economic dependence"), degrees of investment in materials and training, administrative functions and record retention.

The interpretation also raises implicit questions of distinction as to economic dependence where the provider/FSP and consumer/Recipient family are in other than an "economically dependent relationship" either as between themselves or, in consequence, as to a putative employer. *See, e.g., id.* at 9.

2018-4") – In which the Administrator primarily addresses application of the Final Rule
and FLSA to "registries" which "typically match[ ] people who need caregiving services
with caregivers who provide the services". *Id.* at 1. The factors assessed largely overlap
those generally considered in an economic realities assessment and discussed in
DOL/WHD 2014-2, but include some further discussion of additional considerations
potentially related to open-registry arrangements such as "conducting background and
reference checks", "receiving continuous payments for caregiver services" where the
registry fee is a function of the number of hours a caregiver works for a client rather than
a lump-sum initial client fee, payroll functions and a registry's potential position as
effective guarantor of provider payment, and the extent and nature of hours verification
or payroll services. *Id.* at 4-8.

As with a general-factor-based determination of employer or joint employer status under
the FLSA as governed by the Third Circuit precedent discussed above, factual disputes and/or
evidentiary insufficiencies also prevent the Court from locating (to a summary judgment
standard) the parties' work relationship within the DOL's Final Rule, and current regulatory
definitions and Administrative guidelines for employment status that are more specific to
"companionship services" and the relationships of federal-funding Recipients and agencies
providing or facilitating in-home care services. This is not a "shared living" arrangement. Nor is
it a consumer-directed "cash and counseling program" or "public authority model" cleanly
within any of the interpretative hypotheticals of employment versus non-employment status.
Nor is it an entirely circumscribed "registration" program.    Rather, it is a case in which

employment status will necessarily turn on a highly-individual, fully-informed and fact-specific assessment of the over-arching "economic reality" of the Recipient-family-FSP-agency relationships and the workers' "dependence" on the putative employers - an overall assessment made under the precedent of this Circuit, the FLSA and Final Rule, and the guidance of the Department of Labor, Wage & Hours Division's interpretations and bulletin.[28]

## V.    CONCLUSION

For the foregoing reasons, and in that the Court cannot hold as a matter of law at this juncture that Plaintiffs were employees of ARC subsequent to the September 2015 ICAs, or employees of FCBHA at any time, it is respectfully recommended that:

(a) the Motion for Partial Summary Judgment Restricted to the Issue of Whether Plaintiffs Were Employees of Defendant or Independent Contractors (ECF No. 26) filed by Plaintiffs Jesse Lynn and Belinda Darnell against Defendant ARC be **DENIED** without prejudice;

(b) the Motion for Summary Judgment (ECF No. 41) filed by Defendant ARC be **DENIED** without prejudice;

(c) the Motion to Dismiss or in the Alternative for Summary Judgment (ECF No. 63) filed by Defendant Fayette County Behavioral Health Administration be **DENIED** without prejudice as it is not clearly futile to afford Plaintiffs an opportunity to further

---

[28] *See* DOL/WHD 2014-2 at 3 ("[B]ecause the ultimate question is one of economic dependence, the factors are not to be applied as a checklist, but rather the outcome must be determined by a qualitative rather than a quantitative analysis.") (citing 29 CFR Part 79;, 29 CFR 500.20 (h); *Charles v. Burton*, 169 F.3d 1322 (11th Cir.), *cert. denied*, 528 U.S. 879 (1999); *Lopez v. Silverman*, 14 F.Supp.2d 405 (S.D.N.Y. 1998)).

amended their Complaint, there may be questions of material fact as to the

relationships between Plaintiffs and both Defendants ARC and FCBHA, and

FCBHA's Motion in the Alternative is premature;

(d) the Motion to Amend Complaint in Response to Motion to Dismiss (ECF No. 69)

filed by Plaintiffs be **GRANTED** in the form of an Order that Plaintiffs be directed to

file an appropriate Second Amended Complaint within twenty (20) days from the date

of the Court's Order on these motions;

(e) the Motion for Reconsideration of this Court's Order on the Motion for Joinder or in

the Alternative to Stay (ECF No. 65) filed by Defendant FCBHA be **DENIED** as

there is no basis to alter the Court's previous holding permitting joinder (ECF No. 33)

and the Motion in the Alternative to stay will be rendered moot by the Court's Order

on the pending Motions;

(f) the Motion for Summary Judgment (ECF No. 72) filed by Plaintiffs against

Defendant FCBHA be **DENIED** without prejudice in keeping with the Court's other

rulings above; and

(g) the Motion to Strike Plaintiff's Motion For Summary Judgment (ECF No. 75) filed by

FCBHA be **DENIED AS MOOT** given the Court's recommendation as to said

Motion.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and

Local Rule of Court 72.D.2, the parties are allowed fourteen (14) days from the date of service to

file objections to this report and recommendation.  Any party opposing the objections shall have

fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely

objections will constitute a waiver of any appellate rights.

Dated:  September 11, 2018                              BY THE COURT:


                                                       _____
                                                       LISA PUPO LENIHAN
                                                       United States Magistrate Judge